J-E02002-21

2022 PA Super 61

| | | |
|---|---|---|
| ERIC DOBRANSKY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EQT PRODUCTION COMPANY AND | : | No. 900 WDA 2019 |
| HALLIBURTON ENERGY SERVICES, | : | |
| INC. | : | |

Appeal from the Order Entered May 22, 2019
In the Court of Common Pleas of Greene County Civil Division at No(s):
AD 142-2014


BEFORE:  PANELLA, P.J., BENDER, P.J.E., BOWES, J., LAZARUS, J., OLSON, J., DUBOW, J., KUNSELMAN, J., MURRAY, J., and McCAFFERY, J.

OPINION BY BENDER, P.J.E.:                    **FILED: APRIL 11, 2022**

Appellant, Eric Dobransky, appeals from the trial court's May 22, 2019 order granting summary judgment in favor of Appellees, EQT Production Company ("EQT") and Halliburton Energy Services, Inc. ("HESI") (referred to herein collectively as "Appellees").  After careful review, we vacate the trial court's order and remand.  In addition, we deny Appellees' application to strike and preclude argument.

The matter before us concerns whether HESI — and by extension, EQT — qualify as statutory employers under the Workers' Compensation Act ("WCA" or "the Act")[1] and, as such, enjoy immunity from tort liability for injuries suffered by Mr. Dobransky.  By way of background, under the WCA,

_____

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041; 2501-2710.

employers must pay workers' compensation benefits, regardless of negligence, to employees who sustain injuries in the course of their employment. **See** 77 P.S. § 431. In exchange for receiving these benefits without having to prove negligence, employees may not sue their employers in tort for injuries they incurred in the course of their employment. **See** 77 P.S. § 481(a). In other words, with respect to work-related injuries, the employers have immunity from tort liability.

Pertinent to the issues before us, pursuant to Section 302(a) of the WCA, codified at 77 P.S. § 461, certain contractors who meet a specialized definition take on secondary liability for the payment of workers' compensation benefits to the injured employees of their subcontractors. **See** 77 P.S. § 461; **see also Six L's Packing Co. v. W.C.A.B. (Williamson)**, 44 A.3d 1148, 1157 (Pa. 2012). Thus, in the event the subcontractor-employers cannot or will not pay workers' compensation benefits to their subcontractor-employees, these contractors assume workers' compensation liability. 77 P.S. § 461. As such, despite not being the actual employers of the subcontractor-employees, these contractors are considered "statutory employers" of the subcontractor-employees due to their treatment under the WCA. **See Patton v. Worthington Associates, Inc.**, 89 A.3d 643, 645 (Pa. 2014). Like the treatment of actual employers under the WCA, in return for assuming secondary liability for the payment of workers' compensation benefits, statutory employers enjoy immunity in tort for injuries the subcontractor-employees receive during the course of their employment. **See** 77 P.S. §

481(a); ***Doman v. Atlas America, Inc.***, 150 A.3d 103 (Pa. Super. 2016). The contractors enjoy this immunity "by virtue of statutory-employer status alone, such that it is accorded even where the statutory employer has not been required to make any actual benefit payment." ***See Patton***, 89 A.3d at 645 (citing ***Fonner v. Shandon, Inc.***, 724 A.2d 903, 907 (Pa. 1999)) (footnote omitted).

**Facts**

With that background in mind, we now turn to the facts before us. This case arises out of injuries sustained by Mr. Dobransky from his exposure to barite at Scott's Run, a natural-gas well site leased and operated by EQT, on June 19, 2012.[2, 3] In order to drill and produce natural gas at Scott's Run, EQT subcontracted with numerous companies, including HESI. **See** Maddox's Dep. at 12-13. Pursuant to a master services agreement ("MSA"), EQT contracted with HESI to perform various services for it related to both drilling and hydraulic fracturing. **See** Appellees' Motion for Summary Judgment, 7/2/18, at Exhibit B ("MSA"); Appellees' Brief at 5-6; Mr. Dobransky's Substituted Brief at 7. Notably, at the Scott's Run site, HESI provided EQT

---

[2] As we discuss further *infra*, barite is "a weighing agent to increase densities of industrial drilling fluids." Trial Court Opinion ("TCO"), 5/22/19, at 2.

[3] The type of well at Scott's Run was a Marcellus horizontal well. **See** Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 21 ("Maddox's Dep.") at 15.

with mud services.  Maddox's Dep. at 16-17.  Bradley Maddox, EQT's director

of drilling, described the mud services provided by HESI as follows:

> [Mr. Dobransky's counsel:] [W]hat does providing mud services mean?
>
> [Mr. Maddox:] So to drill a horizontal well, we have to have mud in the hole to keep the hole open and stable, and carry cutting out of the hole.  And [HESI's] function in that role is to provide [EQT] a mud that will provide … those qualities to be able to drill the well successfully and get casing in the ground.
>
> ***
>
> [Mr. Dobransky's counsel:] And when you say mud, can you define mud for me?
>
> [Mr. Maddox:] It is a water-based, semi[-]saturated, polymer-based fluid, that has a variety of products in it to give it the properties we need to drill the well.
>
> [Mr. Dobransky's counsel:] Are you able to tell me what's in it?
>
> [Mr. Maddox:] Barite is one of them.  Xanthan gum is another one.  Salt is another product.  We have a polymer. … There could be other products in there … a pH pack ten, I think is another product in there.  There's a lot of products in the mud that give it the consistency that we need, keep the pH in check and the other properties.
>
> [Mr. Dobransky's counsel:] Why is barite necessary?
>
> [Mr. Maddox:] It's a weighting material.
>
> [Mr. Dobransky's counsel:] Meaning it has weight?
>
> [Mr. Maddox:] Yes.
>
> [Mr. Dobransky's counsel:] Why is that necessary?
>
> [Mr. Maddox:] We need weight….  [W]hen drilling a horizontal well, the overburden of the formation that we are drilling, if we didn't have a fluid in there that had … hydrostatic weight to push back against that formation, the hole would not remain open to get our drill bit through it and our casing in the ground.

Maddox's Dep. at 17, 18-19; *see also id.* at 7.

In providing EQT with mud services, HESI was responsible for gathering the necessary raw materials to create the drilling mud, maintaining and inspecting the tanks that held the barite, and keeping track of inventory. *Id.* at 27; Mr. Dobransky's Substituted Brief at 15 ("[HESI] did not purchase the 'mud' from a third[-]party supplier, but instead collected the necessary raw materials to have the mud blended and stored at the EQT well site."); Appellees' Brief at 22 (noting that HESI required that barite be delivered in order to make the drilling mud).

In order to have the barite used in the drilling mud delivered to the Scott's Run well site, HESI executed a transportation agreement with Northwest Concrete Products, Inc., d/b/a Northwest Logistics ("Northwest"), under which Northwest agreed to "transport the goods or materials tendered to it by [HESI] or any supplier of [HESI] to and from the origin and/or destination points (and stop off points in between) as designated by [HESI]…." Appellees' Motion for Summary Judgment at Exhibit C ("Transportation Agreement") at ¶ 1; *see also* Mr. Dobransky's Substituted Brief at 15; Appellees' Supplemental Brief at 16-17. Northwest also unloaded the goods and materials it transported. *See* Appellees' Brief at 6; Appellees' Supplemental Brief at 9, 16-17; Mr. Dobransky's Substituted Brief at 10.

Northwest employed Mr. Dobransky as a truck driver. TCO at 2. On the day in question, Mr. Dobransky was delivering barite to the Scott's Run site. When unloading the barite into HESI's storage tank, the cap blew off, releasing

barite onto Mr. Dobransky's face and onto his person. *Id.* at 2-3. Mr. Dobransky claims that, among other deficiencies, the tank was missing a ball valve and pressure gauge. *Id.* at 3. As a result of his exposure to the barite, Mr. Dobransky alleges that he sustained severe and serious injuries, including losing nearly half of his lung capacity. *See, e.g.*, First Amended Complaint, 5/2/14, at ¶ 12.

## Procedural History

Mr. Dobransky subsequently filed a negligence action against Appellees. On July 2, 2018, Appellees filed a motion for summary judgment, arguing that they were Mr. Dobransky's statutory employers under Section 302(a) of the WCA, and, therefore, immune from tort liability. Section 302(a) provides:

> A contractor who subcontracts all or any part of a contract and his insurer shall be liable for the payment of compensation to the employes of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured its payment as provided for in this act. Any contractor or his insurer who shall become liable hereunder for such compensation may recover the amount thereof paid and any necessary expenses from the subcontractor primarily liable therefor.

> For purposes of this subsection, a person who contracts with another (1) to have work performed consisting of (i) the removal, excavation or drilling of soil, rock or minerals, or (ii) the cutting or removal of timber from lands, or (2) to have work performed of a kind which is a regular or recurrent part of the business, occupation, profession or trade of such person shall be deemed a contractor, and such other person a subcontractor. This subsection shall not apply, however, to an owner or lessee of land principally used for agriculture who is not a covered employer under this act and who contracts for the removal of timber from such land.

77 P.S. § 461 ("Section 302(a)").

In their motion for summary judgment, Appellees — relying on 77 P.S. § 461(1)(i) ("Section 302(a)(1)(i)") and **Doman**, **supra** — argued that HESI contracted with Mr. Dobransky's employer, Northwest, to transport and unload a product at the well site used in the "removal, excavation or drilling" for natural gas, and that consequently, HESI is Mr. Dobransky's statutory employer and immune from tort liability. **See** Appellees' Motion for Summary Judgment at ¶¶ 39, 44. In addition, HESI asserted that, because EQT is in vertical contractual privity with Northwest and HESI, EQT is also Mr. Dobransky's statutory employer such that it, too, is immune from suit. **Id.** at ¶¶ 45-51; **see also Emery v. Leavesly McCollum**, 725 A.2d 807, 811-12 (Pa. Super. 1999) (*en banc*) (determining that a general contractor could qualify as the statutory employer of a sub-subcontractor's employee, given the vertical chain of contracts). As an alternative basis for summary judgment, Appellees argued that they did not have a duty to Mr. Dobransky with respect to the danger alleged in the complaint, **see id.** at ¶¶ 53-78, and that Mr. Dobransky cannot demonstrate that the alleged accident was the legal and proximate cause of the harm he alleges. **Id.** at ¶¶ 79-88.

Thereafter, Mr. Dobransky filed a response in opposition to Appellees' summary judgment motion. In his response, Mr. Dobransky asserted, *inter alia*, that he "was involved in the transporting and unloading of barite and sand used at well sites for his employer, Northwest…. Under the contract, Northwest was to provide bulk and vacuum transportation services." Mr. Dobransky's Response in Opposition to Motion to Summary Judgment, 8/1/18,

at ¶ 39. As such, he denied that he was "performing work involving the removal, excavation, [or] drilling of solid rock [*sic*] or minerals" as contemplated by Section 302(a)(1)(i). **Id.** (emphasis omitted). In addition, he contested the alternative grounds on which Appellees sought summary judgment. **See id.** at ¶¶ 53-88.

On September 4, 2018, the trial court issued an order stating that it would consider the statutory employer defense raised in Appellees' motion for summary judgment. Trial Court Order, 9/4/18, at 1 (unnumbered pages). The trial court permitted the parties to file briefs addressing Appellees' statutory employer defense. **Id.** Moreover, the trial court stated that, pending its decision on the statutory employer issue, all other proceedings and motions were stayed (including consideration of the other grounds for summary judgment raised by Appellees in their motion). **Id.** at 2.[4]

On September 17, 2018, Appellees filed a brief in support of their statutory employer defense. Therein, they elaborated on their Section 302(a)(1)(i) argument, and additionally contended that HESI also qualified as Mr. Dobransky's statutory employer under 77 P.S. § 461(2) ("Section 302(a)(2)"), as the undisputed evidence — including the MSA between EQT and HESI — shows that the "transportation and use of barite are regular and recurrent parts of HESI's business in providing drilling mud such as it did at the Scott's Run site." Appellees' Brief in Support of Statutory Employer

---

[4] At this time, among other things, Mr. Dobransky's motion for leave to file a second amended complaint was pending before the trial court.

Defense, 9/17/18, at 14. Therefore, they insisted that, "in the language of Section 302(a)[(2)], HESI is a statutory employer with respect to Mr. Dobransky because it contracted with Northwest…, Mr. Dobransky's employer, [] 'to have work performed of a kind which is a regular or recurrent part of the business, occupation, profession or trade of' HESI." **Id.** Appellees also reiterated that, because EQT is in vertical contractual privity with HESI and Northwest, EQT likewise qualifies as Mr. Dobransky's statutory employer. **Id.** at 15; **see also Emery**, **supra**.

On October 5, 2018, Mr. Dobransky filed his brief in opposition. Specifically, regarding Appellees' Section 302(a)(2) argument for immunity, Mr. Dobransky countered that the MSA does not require HESI to engage in the transportation of barite to well sites, and that HESI was "engaged in the 'service' of the well site, not in the business of transporting goods and materials to the well site." Mr. Dobransky's Supplemental Brief in Opposition, 10/5/18, at 7. He claimed that Appellees were attempting to overextend the statutory employer doctrine, positing that Appellees' Section 302(a)(2) argument "is akin to saying that a delivery driver who is supplying engine parts to an automotive repair shop and was injured during the process, when a negligently anchored shelving system fell on him, cannot recover against the shop under the statutory employer doctrine. That is an absurdity." **Id.**

On May 22, 2019, the trial court issued an opinion and order, granting summary judgment in favor of Appellees based on their statutory employer defense under Section 302(a)(1)(i) and **Doman**. **See** TCO at 1-7. In doing

so, the trial court did not address whether Section 302(a)(2) applied, nor did it consider any of the other, alternative grounds for summary judgment raised by Appellees in their motion.

Mr. Dobransky subsequently filed a timely notice of appeal. The trial court directed Mr. Dobransky to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and he complied.[5] The trial court then issued a statement in lieu of a Pa.R.A.P. 1925(a) opinion, in which it referenced and relied upon the reasoning set forth in its May 22, 2019 opinion and order.

On August 11, 2020, a divided three-judge panel of this Court vacated the trial court's order and remanded the case for further proceedings in a published opinion. The majority ascertained that Appellees did not qualify as Mr. Dobransky's statutory employers under Section 302(a)(1)(i), as HESI did not contract with Northwest to have work performed consisting of the removal, excavation or drilling of soil, rock or minerals, but instead contracted with Northwest for transportation and product-unloading services generally. In addition, the majority observed that Appellees had devoted a substantial portion of their appellate brief to arguing various alternative grounds for the

_____

[5] We note that, on July 10, 2019, the trial court mistakenly directed Appellees — not Mr. Dobransky —to file a Rule 1925(b) concise statement within 21 days. *See* Trial Court Order, 7/10/19, at 1 (single page). On July 17, 2019, the trial court issued another order, this time correctly directing Mr. Dobransky to file a Rule 1925(b) concise statement within 21 days. *See* Trial Court Order, 7/17/19, at 1 (single page). He did so on August 2, 2019. Therefore, we determine that Mr. Dobransky timely filed his Rule 1925(b) concise statement.

entry of summary judgment in their favor, urging this Court to affirm the trial court's order on one of these other grounds. However, because the trial court did not address any of these arguments below in its opinion, the majority declined to do so in the first instance.

The dissenting opinion agreed with the majority that Appellees did not qualify as Mr. Dobransky's statutory employers under Section 302(a)(1)(i). However, the dissent advanced that it would nevertheless affirm the trial court's order awarding summary judgment to Appellees pursuant to their statutory employer defense under Section 302(a)(2). Specifically, the dissent agreed with Appellees that the uncontested evidence established that HESI regularly and recurrently required that barite be delivered to the well site, and that HESI subcontracted that responsibility to Northwest. In reaching this conclusion, the dissent determined that the text of Section 302(a)(2) contains no requirement of similarity between the overall business activities of the contractor and the subcontractor to trigger its application.

Thereafter, Appellees filed an application for reargument *en banc*, specifically asking this Court to address the Section 302(a)(2) issue and affirm the trial court's grant of summary judgment on that basis. We granted their request and withdrew the panel decisions originally issued in this matter. We now examine whether Appellees are entitled to summary judgment based on their statutory employer defense under either Section 302(a)(1)(i) or Section 302(a)(2).

**Standard and Scope of Review**

At the outset of our review, we acknowledge that:

[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. On appellate review, then,

> an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals.

To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

**Summers v. Certainteed Corp.**, 997 A.2d 1152, 1159 (Pa. 2010) (cleaned up).

### Analysis

*Section 302(a)(1)(i)*

We begin by reviewing the trial court's grant of summary judgment in favor of Appellees under Section 302(a)(1)(i), which provides that "a person who contracts with another … to have work performed consisting of … the removal, excavation or drilling of soil, rock or minerals … shall be deemed a contractor, and such other person a subcontractor." 77 P.S. § 461(1)(i). In granting summary judgment to Appellees on this basis, the trial court wholly

relied on this Court's decision in **Doman**, which it found to be "directly on-point both legally and factually." TCO at 3.

We therefore direct our attention to **Doman**. In that case, the **Doman** Court recounted the facts before it as follows:

In September 2006, Atlas entered into an oil and gas lease with Frieda Springer ("Springer"), for the purpose of drilling, operating, producing, and removing oil and gas from her property in Greene County. Atlas subsequently entered into a Drilling Bid Proposal and Footage Drilling Contract ("Footage Drilling Contract") with Gene D. Yost & Son, Inc. ("Yost"), a drilling contractor, to drill multiple wells in Fayette County and Greene County, including Well No. 13 on Springer's property ("the Springer Well").[2] Under the terms of the Footage Drilling Contract, Yost was required to provide the necessary equipment and labor, and to drill the wells to the contract footage depth, as specified by Atlas.

[2] The Springer Well is a shallow, low-pressure vertical well drilled into the Upper Devonian Shale formation. Such wells commonly involve footage contracts with well-drilling companies, whereby the oil and gas lessee pays the drilling company a per-foot rate to drill to a specified depth, referred to as the contract footage depth. When drilling is complete, the contracted drilling company is required to remove the drilling pipe, "shut in" the well, and remove the drilling equipment so the lessee can move into the production stage.

Yost began drilling at the Springer Well site in November 2007, and the well reached the contract footage depth on December 2, 2007. Yost personnel worked overnight to remove the drilling pipe from the Springer Well and "shut in" the well, leaving the gas in the well bore. The Tulsa Valve, which is situated on top of the well head and is used to contain the gas within the well, was closed at this time. Rock A. Doman ("Doman") and another Yost employee began removing the blow-out preventer flange, which was attached to the Tulsa Valve, from beneath the rig platform. While the men unscrewed the flange from the Tulsa Valve assembly, they inadvertently loosened the pressurized piping below the Tulsa Valve. The Tulsa Valve and the blow-out preventer flange detached from the well head and struck Doman.

> Doman was thrown approximately 60 feet above ground level before landing about 30 to 40 feet from the well rig, and was fatally injured.
>
> Yost paid workers' compensation benefits to Doman's fiancé, for the benefit of her minor child.

***Doman***, 150 A.3d at 104 (footnote omitted).

Doman's estate subsequently initiated a wrongful death and survival action against Atlas, asserting, *inter alia*, various theories of negligence. ***Id.*** at 105. Atlas filed a motion for summary judgment, alleging that it qualified as a statutory employer under Section 302(a)(1)(i) and, therefore, was immune from tort liability. ***Id.*** The trial court granted summary judgment in favor of Atlas, and the estate appealed. ***Id.***

On appeal, the ***Doman*** Court noted that "[a] contractor may be deemed a statutory employer if the requirements of … Section 302(a) … have been satisfied." ***Id.*** at 106 (citations omitted). The Court then observed that statutory employers enjoy immunity from tort liability, and acknowledged that "Section 302(a) does not require the primary contractor to occupy or control a worksite in order to be deemed the statutory employer of the subcontractor's employees." ***Id.*** at 107 (citation omitted).[6] It then discerned:

---

[6] The ***Doman*** Court also noted that our Supreme Court has held that "neither the ***McDonald***[ ***v. Levinson Steel Co.***, 153 A. 424 (Pa. 1930)] test, nor a *per se* owner exclusion applies under Section 302(a)…." ***Doman***, 150 A.3d at 108 (quoting ***Six L's Packing Co.***, 44 A.3d at 1159) (footnote omitted); ***see also id.*** at 105 n.5 ("In ***McDonald***, the Supreme Court set forth the following five elements necessary to create the statutory employer relationship: '(1) an employer who is under contract with an owner or one in the position of an owner[;] (2) premises occupied by or under the control of such employer[;]

[B]ased upon the plain language of the statute, we conclude that the trial court correctly applied Section 302(a) to determine that Atlas is Doman's statutory employer. Because Doman was employed by Yost to perform work involving the "removal, excavation or drilling of … minerals" (natural gas), the facts of this case implicate the specialized definition found in Section 302(a)[(1)(i)]. Atlas, as the primary contractor that subcontracted the drilling process at the Springer Well, is Doman's statutory employer as a matter of law. Consequently, Atlas is entitled to tort immunity … regardless of the fact that Yost already had paid Doman's worker[s'] compensation benefits. ***See Patton***[,] 89 A.3d [at] 645 (holding that "[the Supreme] Court has previously determined that this immunity pertains by virtue of statutory[ ] employer status alone, such that it is accorded even where the statutory employer has not been required to make any actual benefit payments[]"); ***see also Fonner***[,] 724 A.2d [at] 906-08 (stating that the 1974 amendments to the Act did not change a statutory employer's entitlement to tort immunity even if the direct employer paid benefits for a worker's injuries under the Act). Based upon the foregoing, we are constrained by the terms of the Act and the relevant case law to affirm the trial court's [o]rder granting summary judgment in favor of Atlas.

***Id.*** at 109 (footnote and some internal citations omitted).

Despite granting summary judgment in favor of Atlas, the ***Doman*** Court

went on to voice its dissatisfaction with the result it was constrained to reach,

noting:

[T]here have been prior calls to the legislature to reconsider Pennsylvania's statutory scheme. ***See Patton***, 89 A.3d at 650 (Baer, J., concurring) (urging the legislature "to eliminate the doctrine, so that it no longer serves as blanket immunity for general contractors, thwarting a victim's right to recover from a tortfeasor"); ***see also Fonner***, 724 A.2d at 908 (Nigro, J., dissenting) (stating that "[c]ommon sense and logic dictate that the general contractor should not reap the benefits of civil liability [immunity] unless it undertakes responsibility of compensation

---

(3) a subcontract made by such employer[;] (4) part of the employer's regular business [e]ntrusted to such subcontractor[;] [and] (5) an employee of such subcontractor.'") (quoting ***McDonald***, 153 A. at 426).

- 15 -

coverage[]"). We echo those calls and agree that, following the 1974 amendments to the Act, the statutory employer doctrine no longer serves the remedial purpose of the Act. Traditionally, the secondary liability imposed on statutory employers was meant to ensure that an injured worker will be afforded payment of benefits, even in the event of default by his primary employer. ***See Patton***, 89 A.3d at 645; ***see also Six L's Packing***, 44 A.3d at 1158-59 (stating that "the Legislature meant to require persons (including entities) contracting with others … to assure that the employees of those others are covered by workers' compensation insurance, on pain of assuming secondary liability for benefits payment upon a default[]"). The tort immunity associated with the imposition of secondary liability "reflects the historical *quid pro quo* between an employer and employee whereby the employer assumes liability without fault for a work-related injury…." ***Tooey v. AK Steel Corp.***, … 81 A.3d 851, 860 ([Pa.] 2013) (citation omitted). However, the Act was amended in 1974 to require that all employers provide workers' compensation coverage. ***See Fonner***, 724 A.2d at 905 (noting that, prior to 1974, the Act contained "elective compensation" language). Notwithstanding, the 1974 amendments allowed general contractors to remain insulated from tort liability, despite never being required to provide workers' compensation benefits to injured employees of subcontractors, and created a windfall immunity shield.[7] Thus, "the mandatory nature of workers'

---

[7] Then-Justice (now-Chief Justice) Baer has elaborated on the rarity with which statutory employers are held secondarily liable under the WCA, explaining:

"[I]n reality, application of [the 1974] amendments rarely, if ever, will result in the general contractor assuming responsibility for providing workers' compensation insurance because in the modern construction workplace, general contractors will rarely, if ever, award a contract absent the subcontractor showing proof of workers' compensation coverage." ***Fonner***…, … 724 A.2d [at] 908 … (Nigro, J., dissenting). Indeed, since 1974, the only way the statutory employer doctrine will operate to guarantee a workers' compensation payment to an injured worker is if (1) the subcontractor violates the law (unlikely as noted by Justice Nigro); or (2) the religious exemption to the Act applies…. ***See*** 77 P.S. § 484. Thus, the statutory employer doctrine serves one purpose:

> compensation has rendered the statutory employer doctrine obsolete[,] … [and] adversely impact[s] worker safety by eliminating the traditional consequences (money damages) when a general contractor's negligence harms a subcontractor's employee." ***See Patton***, 89 A.3d at 650-51 (Baer, J., concurring); ***see also Travaglia v. C.H. Schwertner & Son, Inc.***, … 570 A.2d 513, 518 ([Pa. Super.] 1989) ("Section 203 of the [ ] Act[, codified at 77 P.S. § 52], which was designed to extend benefits to workers, should not be casually converted into a shield behind which negligent employe[r]s may seek refuge.").

***Doman***, 150 A.3d at 109-10 (some brackets added).

Turning to the case *sub judice*, the trial court — relying on ***Doman*** — reasoned:

> [Mr.] Dobransky initially requests this [c]ourt to find that he was not involved in work related to the "removal, excavation or drilling of ... minerals." The [c]ourt cannot find as such, instead finding that [Mr.] Dobransky's work was pursuant to a contract to have work performed consisting of the removal, excavation or drilling of minerals. 77 P.S. § 461.

> [HESI] worked on the EQT well[]site pursuant to a[n MSA] which contracted [HESI] to perform tasks including drilling. Northwest … was contracted through [HESI] to provide transportation services. Under the above[-]recited ***Doman*** analysis, Section 302(a)[(1)(i)] applies. [HESI] is accordingly [Mr. Dobransky's] statutory employer.

> Vertical privity extends the statutory employer immunity to EQT since EQT had a contract with [HESI] and [HESI] had subcontracted services to Northwest…, the direct employer of [Mr.] Dobransky.

TCO at 6.

---

> to provide immunity to a general contractor in tort, notwithstanding that it may have been a third party tortfeasor.

***Patton***, 89 A.3d at 651 (Baer, J., concurring) (footnote omitted).

- 17 -

On appeal, Mr. Dobransky argues that "[a] person who merely drives a truck to deliver a single raw material to a well site is not a person whose work consists of 'the removal, excavation, or drilling of soil, rock, or minerals' within [Section] 302(a)[(1)(i)] of the … Act." Mr. Dobransky's Substituted Reply Brief at 15 (emphasis and unnecessary capitalization omitted). He contends that **Doman** is distinguishable, as "[t]here was never any question that the Yost employee … who died … at the Atlas drill site was involved in work that consisted of 'drilling,' and thus was a statutory employee of Atlas. This is because Atlas engaged Yost to drill wells, and [Doman] was a Yost employee who died during the final stages of the actual drilling process." *Id.* at 17. Therefore, he asserts that **Doman** "is no basis *per se* for the trial court to have held that [the mere delivery of] one of several raw materials that are combined at a natural gas well to create a fluid that is thereafter poured down an empty bore hole to maintain the integrity of the bore constitutes the actual 'removal' of natural gas, 'excavation' of natural gas, or 'drilling' of natural gas." *Id.* at 16.

> In response, Appellees maintain that,
>
> Mr. Dobransky was involved in transporting and loading a product into tanks at the well[]site that was contemporaneously used in the 'removal, excavation, or drilling' for natural gas.[8] HESI

---

[8] On the day in question, Appellees state that Mr. Dobransky, after filling one barite tank without incident, "alleged that, on request from a HESI employee, he waited approximately a half hour to fill the second tank so that the drilling team could contemporaneously use the barite he had just provided." Appellees' Brief at 10 (footnote omitted). Mr. Dobransky avers that he

worked on the EQT well[]site pursuant to a[n MSA] between the two companies by which HESI performed a variety of tasks related to, among other things, drilling and removal of natural gas. HESI contracted with Mr. Dobransky's employer, Northwest, for transportation and product-unloading services generally, and that contract included the work Mr. Dobransky was performing when he alleges he was injured. Accordingly, HESI was "[a] contractor who subcontract[ed] all or part of a contract" to Mr. Dobransky's employer. Thus, under **Doman**, Section 302(a)[(1)(i)] applies.

Appellees' Brief at 18-19 (footnotes omitted).

Looking at the relevant language of Section 302(a)(1)(i), we determine that the trial court erred in granting summary judgment in favor of Appellees on this basis. Again, Section 302(a)(1)(i) sets forth that "a person who contracts with another … to have work performed consisting of … the removal, excavation or drilling of soil, rock or minerals … shall be deemed a contractor, and such other person a subcontractor." 77 P.S. § 461(1)(i). HESI did not contract with Northwest to have work performed consisting of the removal, excavation or drilling of soil, rock or minerals; instead, Appellees themselves state that "HESI contracted with Mr. Dobransky's employer, Northwest, **for transportation and product-unloading services generally**…." Appellees' Brief at 19 (emphasis added; footnote omitted); **see also** TCO at 6 ("Northwest … was contracted through [HESI] to provide transportation services."). Thus, Northwest did not remove, excavate, or drill for minerals, but simply transported and unloaded materials to the well site. Its work did not include removing, excavating, or drilling. Accordingly, HESI — and by

_____

sustained his injuries while filling the second tank. **Id.** at 11-12; Mr. Dobransky's Substituted Brief at 10.

extension, EQT — are not entitled to summary judgment pursuant to their statutory employer defense under Section 302(a)(1)(i). **See Emery**, **supra**.

*Section 302(a)(2)*

We next consider whether Appellees are entitled to summary judgment based on their statutory employer defense under Section 302(a)(2). Although the trial court did not reach this question, we will exercise our discretion to address it in the first instance, as the parties have both briefed this issue, and it would serve judicial economy for us to consider this controversy now. **See Branton v. Nicholas Meat, LLC**, 159 A.3d 540, 562 n.21 (Pa. Super. 2017) (noting that we can reach an issue not considered by the trial court, as we may affirm the trial court's decision on any basis); **see also In re A.J.R.-H.**, 188 A.3d 1157, 1176 (Pa. 2018) ("It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate.") (quoting **Sec. & Exch. Comm'n v. Chenery Corp.**, 318 U.S. 80, 88 (1943)). Further, we acknowledge that Appellees specifically sought *en banc* review for us to resolve this issue. **See** Appellees' Application for Panel Reconsideration/Reargument, 8/14/20, at 8 ("EQT and HESI respectfully request that the Panel reconsider its decision and modify it to (1) consider the Section 302(a)(2) alternative basis for affirmance, (2) adopt [the dissent's] analysis and (3) affirm on that alternative basis.").

As set forth *supra*, Section 302(a)(2) provides that "a person who contracts with another … to have work performed of a kind which is a regular or recurrent part of the business, occupation, profession or trade of such person shall be deemed a contractor, and such other person a subcontractor." 77 P.S. § 461(2). Appellees argue that HESI's contractual relationship with Northwest satisfies these requirements. They say that (1) "HESI is in the 'business' or 'trade' of providing well[]site services, and a 'regular or recurrent' part of that business or trade is delivering and unloading barite for use at well sites"; (2) "HESI contracted with Northwest … for Northwest … to (repeatedly) deliver barite and unload it into onsite tanks to meet HESI's contractual obligation to EQT"; and (3) "Mr. Dobransky is employed by Northwest … and, indeed, was performing the work HESI contracted for Northwest … to perform." Appellees' Supplemental Brief at 13-14 (footnotes omitted).

Mr. Dobransky, on the other hand, asserts that HESI does not qualify as his statutory employer under Section 302(a)(2) simply because he delivered a single raw material to HESI. *See* Mr. Dobransky's Substituted Brief at 17-19. Mr. Dobransky emphasizes that his employer, Northwest, is in the transportation business, and that HESI is not a transporter of barite or any other type of freight. *Id.* at 18. He argues that HESI's function at the Scott's Run well site was to supply drilling mud, and that "[a]lthough [HESI] — like thousands of other businesses — requires the delivery of materials that are consumed in one manner or another in the recipient's business, that fact alone cannot render the truck driver who delivers those materials a statutory

employee of the recipient." *Id.*; *see also id.* at 21 ("The use of an object that has been transported or delivered does not render the 'transportation' or 'delivery' of such object a regular or recurrent part of the recipient's business for purposes of [Section] 302(a)(2).").  He posits:

> Consider the retail industry … where there is a regular and recurring need to replenish inventory for sale.  An opinion *en banc* from this Court that Mr. Dobransky was [HESI's] statutory employee because he delivered a material that [HESI] "needed" (in this instance, to be blended with other materials and then sold as drilling mud to EQT) could apply by simple extension to every retail business, because the "need" for more salable inventory is the *sine qua non* of the retail industry.

*Id.* at 19-20.

Our review of the relevant case law reveals that Section 302(a)(2) has been applied where the contractor contractually delegates aspects of its business, occupation, profession, or trade to a subcontractor.  *Cf. Saladworks, LLC v. W.C.A.B. (Gaudioso)*, 124 A.3d 790, 799 (Pa. Cmwlth. 2015) (determining that Saladworks was not the statutory employer of a franchisee's injured employee where Saladworks's "main business is the sale of franchises to franchisees that desire to use its name and 'System' and marketing expertise.  … While Saladworks provides certain services to independent franchisees…, it is not in the restaurant business or the business of selling salads") *with Zwick v. W.C.A.B. (Popchocoj)*, 106 A.3d 251, 256 (Pa. Cmwlth. 2014) ("[T]he evidence established that Zwick was in the business of rehabilitating properties for resale and that the construction work [the c]laimant performed was a regular part of Zwick's business.  Accordingly,

… Zwick was a statutory employer under [S]ection 302(a)….")[9]; ***Six L's***

***Packing Co. v. W.C.A.B. (Williamson)***, 2 A.3d 1268, 1280-81 (Pa. Cmwlth.

_____

[9] We respectfully disagree with the Dissent's reading of ***Zwick***. In ***Zwick***, Zwick "testified that he is a licensed realtor and investor ***and does construction rehabilitation work on residential properties***." ***Zwick***, 106 A.3d at 253 (emphasis added; citation omitted). As a part of his construction rehabilitation work on residential properties, Zwick hired Adarlan Rodrigues to perform construction work on a property, and Rodrigues in turn hired Marco Popchocoj (the claimant) to complete certain projects there. ***See id.*** at 252-53. Zwick did not own the property, but was fixing it up for resale. ***Id.*** at 253. He told Rodrigues what work needed to be done, inspected the property periodically, and approved the completed work before paying Rodrigues. ***Id.*** When performing work at the property, Popchocoj was injured while installing a hardwood floor. ***Id.*** at 252-53. Though Zwick insisted that Section 302(a) did not apply because he is a licensed realtor — so the work performed by Popchocoj at the time of Popchocoj's injury was not a regular part of Zwick's business — the Commonwealth Court determined that "[t]he record belies this claim." ***Id.*** at 255. It noted that Zwick "testified that construction rehabilitation work was a part of his business" and that he was "essentially the general contractor on the job." ***Id.*** (quotation marks and citations omitted). Thus, the Commonwealth Court concluded that Section 302(a)(2) applied because the evidence shows that "Zwick was in the business of rehabilitating properties for resale and that he hired Rodrigues to perform work that was a regular part of his business." ***Id.***

The Dissent claims that "[s]ince Zwick regularly solicited construction rehabilitation work from the claimant and other parties, the Commonwealth Court found that Zwick met the definition for a statutory employer under Section 302(a)(2) ***even though he was not directly engaged in carrying out construction work himself***." Dissenting Op. at 12 (citation omitted; emphasis added). We disagree with this interpretation. Initially, the evidence demonstrated that Zwick was not only in the business of selling houses ***but also in the business of conducting construction rehabilitation work on residential properties***. Moreover, while there may not have been evidence of Zwick himself physically performing construction work at the property (*i.e.*, Zwick's installing flooring, drywalling, *etc.*), we nevertheless consider him to be directly engaged in the business of construction, given that he "testified that construction rehabilitation work was a part of his business" and that he was "essentially the general contractor on the job." ***Zwick***, 106 A.3d at 255 (quotation marks and citations omitted).

2010), *affirmed by*, 44 A.3d 1148 (Pa. 2012) (determining that a subcontractor's employee who was injured while transporting tomatoes was a statutory employee of the contractor, a company which "farms, packs, and distributes tomatoes. It grows tomatoes in Pennsylvania. It processes tomatoes in [Maryland]. The transport of tomatoes from one location to another is a regular and recurrent part of its business"); *see also Garlick v. Trans Tech Logistics, Inc.*, 636 F. App'x. 108, 112 (3d Cir. 2015) (non-precedential) ("Transporting bulk liquids was a regular and recurrent part of QC's business as a bulk tank truck network operator, and QC 'contractual[ly] delegate[d] … aspects of' its transportation business to TTL[, a company that leased its vehicles and provided drivers to QC]. Accordingly, QC, as the contractor, was a statutory employer pursuant to Section 302(a) who assumed secondary liability to pay workers' compensation benefits to employees of its subcontractor, TTL, should TTL default on its obligations.") (citation omitted; some brackets added); *Cargill Meats v. W.C.A.B. (Heffner)*, 2016 WL 7473850, at *5 (Pa. Cmwlth. filed Dec. 29, 2016) (non-precedential) (determining that a contractor that produced meat products was the statutory employer under Section 302(a)(2) of its subcontractor's employee — a truck driver — where the contractor "stipulated that it has its own trucking distribution network; that it uses this trucking distribution network to transport its products from, among other places, its Wyalusing facility where [the truck driver] was injured; that it routinely uses the services of outside trucking companies such as [the subcontractor] to handle its excess

transportation needs for its products including its Wyalusing facility; and that it entered into a contract with [the subcontractor] to transport products from its Wyalusing facility. Based on these facts, the Board correctly concluded that the transportation of the finished meat product to [the contractor's] customers from [its] facilities is a 'regular or recurrent part' of [the contractor's] business").[10, 11]

Here, Appellees do not definitively demonstrate that the transportation and unloading of barite was an aspect of HESI's business or trade, and that HESI contractually delegated that aspect of its business or trade to Northwest. While Appellees point to Section 2.1.1 of the MSA and a sales order form to

_____

[10] We recognize that decisions of the Commonwealth Court and federal circuit courts are not binding upon this Court, but may serve as persuasive authority. **Commonwealth v. Bowers**, 185 A.3d 358, 362 n.4 (Pa. Super. 2018) (citation omitted); **Commonwealth v. Orie**, 88 A.3d 983, 1013 n.49 (Pa. Super. 2014) (citation omitted). We also acknowledge that the **Garlick** Court noted that its decision does not constitute binding precedent within its jurisdiction. **Garlick**, 636 F. App'x. at 110 (citing Rule 5.7 of the Third Circuit's internal operating procedures). However, that decision may nevertheless be cited for its persuasive authority. **See** Fed.R.App.P. 32.1 (stating that federal courts may not prohibit or restrict the citation of federal judicial opinions designated as non-precedential that were issued on or after January 1, 2007). Similarly, the **Cargill** case may be cited for its persuasive value but is not treated as binding precedent by the Commonwealth Court. **See** Pa. Cmwlth. Ct. I.O.P. § 414 ("Parties may also cite an unreported panel decision of this [c]ourt issued after January 15, 2008, for its persuasive value, but not as binding precedent.").

[11] Referencing **Six L's**, **Cargill**, and **Garlick**, the Dissent observes that Pennsylvania courts have tended to conclude that Section 302(a)(2) applies to truck drivers. **See** Dissenting Op. at 7-8. We emphasize, though, that the act of transporting goods between locations was a major function of the statutory employers' businesses in those cases.

argue that HESI was both a regular supplier and transporter of barite, such evidence is flawed and unconvincing. *See* HESI's Supplemental Brief 18-19 ("The [MSA] between EQT and HESI and the sales order … demonstrate that EQT called upon HESI to both provide and *transport* barite to the well site. Thus, HESI was in fact both a regular supplier and transporter of barite….") (emphasis in original; footnote omitted); *see also id.* at 8 n.11 (discussing Section 2.1.1 of the MSA and sales order).

> Section 2.1.1 of the MSA states, in relevant part, the following:

> The Parties acknowledge that from time to time, [EQT] may request that [HESI] perform work and services on one or more of its projects. [EQT] and [HESI] agree that, in the event [EQT] desires to engage [HESI] to perform work and services in connection with one or more such projects and desires to accept [HESI's] bid or price quotation for the scope of work, [EQT] shall issue a Purchase Order containing a scope of work to be performed at any identified Project….

MSA at § 2.1.1. Appellees purport that an EQT-HESI sales order form "indicates acceptance by HESI of EQT Purchase Order No. 110231OC for Baroid 41® and 'Ba. Transportation.'" Appellees' Supplemental Brief at 8 n.11 (citation omitted). Yet, the sales order form Appellees rely on was issued by HESI — not EQT — and does not clearly demonstrate that EQT issued a purchase order for Baroid 41® and 'Ba. Transportation.' *See* Appellees' Brief in Support of Statutory Employer Defense at Exhibit G. Further, Appellees point us to no purchase order issued by EQT in the record or any other evidence connecting this sales order form to Section 2.1.1 of the MSA. Thus, we cannot agree with Appellees that the MSA and the sales order form

indisputably establish that HESI was in the business of supplying and transporting barite.[12, 13]

Instead, viewing all facts and reasonable inferences in a light most favorable to Mr. Dobransky, the evidence shows that HESI was in the business of providing well site services, which included mud services. *See Summers*,

---

[12] As the Dissent points out, Section 8.5 of the MSA provides that:

> **8.5    Materials to Be Furnished.**  All materials furnished and used in connection with the Work shall be new, of good quality and approved by [EQT].  [HESI] shall cause all materials and other parts of the Work to be readily available as and when required or needed for or in connection with the construction, furnishing and equipping of the Project or the Work.

MSA at § 8.5; *see also id.* at § 1.2 (defining "Work" as the "*services required of [HESI] by the Purchase Order*, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by [HESI] to fulfill [its] obligations") (emphasis added).  Relying on Section 8.5, the Dissent advances that "HESI was under a contractual obligation to ensure that barite was 'readily available as and when required or needed for or in connection with the construction, furnishing and equipping of the Project or the Work.'"  Dissenting Op. at 10 (citing MSA at § 8.5).  However, without a corresponding purchase order pursuant to Section 2.1.1 of the MSA, Section 8.5 fails to establish anything about HESI's contractual responsibilities at Scotts Run with respect to barite.

[13] On February 18, 2021, Appellees filed an application for relief with this Court, requesting that we strike certain contentions made in Mr. Dobransky's substituted reply brief related to the sales order form because he did not raise them in the trial court or in his earlier appellate filings.  We deferred review of Appellees' request until after oral argument.  Upon review, we conclude that Mr. Dobransky's substituted reply brief appropriately responds to the arguments raised by Appellees in their brief.  *See* Pa.R.A.P. 2113(a) (conveying that "the appellant may file a brief in reply to matters raised by [the] appellee's brief … and not previously addressed in [the] appellant's brief").  Accordingly, we deny Appellees' application for relief.

*supra*; *see also* MSA; Maddox's Dep. at 16-17; Appellees' Brief at 5-6; Mr. Dobransky's Substituted Brief at 7. In order to make drilling mud for EQT, HESI needed barite, among other items, and therefore contracted with Northwest to transport and deliver barite to it. *See* Maddox's Dep. at 16-19, 27; Transportation Agreement; Mr. Dobransky's Substituted Brief at 15; Appellees' Brief at 22. Therefore, the evidence establishes, at most, that HESI needed barite for making the drilling mud and that it had Northwest transport and deliver barite to it at the well site.

However, the fact that an entity contracts with a subcontractor to have materials delivered to it in order to conduct its business or trade does not mean that a part of that entity's business or trade is the transporting and/or shipping of those materials from one place to another.[14, 15] Otherwise, as Mr.

---

[14] Similarly, if HESI regularly contracted with a mining company to supply the barite in the first place, it does not mean that HESI's business included the mining of barite. In other words, HESI would not be the statutory employer of the barite miner.

[15] The Dissent stresses that HESI accounted for at least 99% of Northwest's business in 2012, provided similar mud services at all of EQT's well sites, and retained multiple transportation subcontractors like Northwest. *See* Dissenting Op. at 6, 10. Initially, we disagree with some of these assertions, given our standard of review. *See Summers*, *supra* ("When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party."). First, Jeremy Johnson — the former operations manager for Northwest's dry bulk division in Greensburg, Pennsylvania — testified that, in 2012, HESI accounted for 99% of Northwest's business **in Pennsylvania**, and suggested that Northwest had drivers and employees working in other states, particularly Texas, at that time. Mr. Dobransky's Omnibus Brief Opposing Appellees' Motion for Summary Judgment, 8/1/18, at Exhibit 20 at 9-10.

- 28 -

Dobransky cautions, any entity that contracts for the regular delivery of materials to use in its business or trade would be the statutory employer of the truck driver(s) delivering such materials to it. **See** Mr. Dobransky's Substituted Brief at 19-20.[16] Under the circumstances of the case *sub judice*,

---

Second, with respect to HESI's purportedly requiring multiple transportation subcontractors like Northwest, we observe that HESI itself did not identify any transportation subcontractors having dealings on the well site in its responses to Mr. Dobransky's third set of interrogatories. **See** Mr. Dobransky's Omnibus Brief Opposing Appellees' Motion for Summary Judgment, 8/1/18, at Exhibit 16 at Question 22 (HESI's naming Patterson Drilling, HESI, and EQT when asked to identify "any other entity or company having control or dealings on this particular well site on June 19, 2012 and for one year prior thereto"). We also note that the Northwest employee who testified that HESI had other transportation subcontractors could not identify these subcontractors and did not state how many there were. **See** Mr. Dobransky's Omnibus Brief Opposing Appellees' Motion for Summary Judgment, 8/1/18, at Exhibit 14 at 15.

In any event, notwithstanding these objections to the Dissent's assertions, the fact that HESI was Northwest's primary customer in 2012, provided similar mud services at all of EQT's well sites, and had other transportation subcontractors does not establish that HESI was in the business of transporting barite. Instead, this evidence simply confirms that HESI needed barite to make the drilling mud.

[16] So, for instance, if a delivery person was injured by a grocery store's negligence while making a regular delivery to the store pursuant to a contractual agreement, that delivery person would be the statutory employee of the grocery store. Thus, the grocery store would assume secondary liability for workers' compensation, and the delivery person would be unable to recover in tort from the grocery store for his/her injuries under Section 302(a)(2). Likewise, if a bakery recurrently contracted with a supply company to deliver flour to it, the bakery would be the statutory employer of the supply company's employees. Under Section 302(a)(2), if the supply company's employee was hurt while making a delivery to the bakery, the bakery would be held secondarily liable for paying the employee workers' compensation benefits, and the employee would be unable to sue the bakery in tort for his/her injuries.

we decline to expand the scope of the oft-criticized Section 302(a)(2) to delivery persons like Mr. Dobransky by interpreting it in such a broad manner. *Accord* Mr. Dobransky's Substituted Brief at 12 ("A holding to the contrary would expand a compensation scheme — which has been repeatedly ridiculed as obsolete in light of subsequent changes to other sections of the [WCA] — beyond its obvious remedial contours and legislative underpinnings."); *see also* pages 15-17, *supra*.[17]  Thus, based on the foregoing, summary judgment in favor of Appellees is likewise unwarranted on this basis.

## Conclusion

In sum, we conclude that HESI (and therefore EQT) have not indisputably demonstrated that they qualify as Mr. Dobransky's statutory employers under either Section 302(a)(1)(i) or Section 302(a)(2).  We

---

[17] While it is irrelevant to our analysis because a statutory employer is entitled to tort immunity even if the actual employer paid workers' compensation benefits, *see, e.g.*, *Fonner*, *supra*, we note that HESI was never exposed to any actual liability under the WCA.  *See* Mr. Dobransky's Substituted Brief at 20 (noting that Northwest maintained workers' compensation insurance and that Mr. Dobransky received benefits through Northwest).  Indeed, both HESI and EQT contractually required Northwest to carry workers' compensation insurance.  *See* Transportation Agreement at 3 (requiring that Northwest maintain workers' compensation insurance, as prescribed by applicable law); MSA at § 10.1 (requiring that HESI comply with certain insurance requirements as set forth in Schedule A); *id.* at Schedule A (stating that HESI and its subcontractors shall carry "[w]orkers['] compensation insurance with statutory limits in full compliance with the workers' compensation and occupational disease act of every state in which the [w]ork is to be performed"); *see also* footnote 7, *supra* (discussing the rarity with which statutory employers are held secondarily liable under the WCA as "general contractors will rarely, if ever, award a contract absent the subcontractor showing proof of workers' compensation coverage") (citation omitted).

therefore vacate the trial court's order granting summary judgment in Appellees' favor and remand for further proceedings.[18]

Order vacated. Case remanded. Appellees' application to strike and preclude argument denied. Jurisdiction relinquished.

---

[18] We decline to address any other, alternative grounds that Appellees advance for why summary judgment should be entered in their favor. The trial court specifically stayed consideration of the other grounds for summary judgment raised by Appellees in their motion pending its decision on the statutory employer issue. Trial Court Order, 9/4/18, at 2 (unnumbered pages). In addition, the trial court indicated that — if it denied Appellees' motion for summary judgment based on the statutory employer defense — it would consider Mr. Dobransky's motion for leave to file a second amended complaint. *Id.*; *see also* Appellees' Brief in Opposition to Mr. Dobransky's Motion for Leave to File Second Amended Complaint, 7/17/18, at 1 ("Mr. Dobransky now seeks to amend his complaint to add more than five times the number of allegations as are included in the currently governing complaint, to add or significantly revise his claims[,] and to add a demand for punitive damages.") (emphasis omitted); Mr. Dobransky's Reply to Appellees' Brief in Opposition to Mr. Dobransky's Motion for Leave to File Second Amended Complaint, 8/15/18, at 2 ("If this [c]ourt grants [Mr. Dobransky's] instant Motion for Leave to File Second Amended Complaint, [Mr. Dobransky's] Second Amended Complaint itself would then form part of the record, which this [c]ourt should therefore include in its record review in deciding [Appellees' motion for summary judgment]. … In the attached, revised Second Amended Complaint, [Mr. Dobransky] simply has amplified previous allegations of negligence and recklessness on the part of [Appellees].").  Furthermore, the trial court stated that "[i]f the [c]ourt denies [Appellees'] motion for summary judgment addressing the statutory employer defense" and "[i]f the [c]ourt grants leave to file a second amended complaint, [Appellees] shall have an opportunity to revise their other grounds for summary judgment to address new or amended allegations of the second amended complaint." Trial Court Order, 9/4/18, at 2 (unnumbered pages). We also acknowledge that Appellees sought *en banc* review of the statutory employer issue only. *See* Appellees' Application for Panel Reconsideration/Reargument, 8/14/20, at 3 (asking this Court to "reconsider its decision by revising it to … address the Section 302(a)(2) issue and then affirm[] on that alternative basis"). Thus, due to these circumstances, we think it prudent to not reach any other, alternative grounds raised by Appellees for why they are entitled to summary judgment and remand the case.

President Judge Panella and Judge Lazarus, Judge Kunselman and Judge McCaffery join this opinion.

Judge Bowes files a dissenting opinion in which Judge Olson, Judge Dubow and Judge Murray join.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2022